UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CDJ BUILDERS, LLC,

      Plaintiff/Counter-Defendant,

                                Case No. 12-10772

v.                                Patrick J. Duggan

FIDELITY NATIONAL TITLE
INSURANCE CO.,

      Defendant/Counter-Plaintiff.
_____/

**<u>OPINION AND ORDER GRANTING PLAINTIFF/COUNTER-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT/COUNTER-PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

CDJ Builders, LLC ("CDJ") filed this lawsuit seeking damages arising from a defect in title caused by a construction lien that it claims was not noted in or excepted from a title insurance policy issued by the predecessor of Fidelity National Title Insurance Co. ("Fidelity"). In its Complaint, CDJ asserts a single count against Fidelity alleging breach of the title insurance policy. Fidelity filed a counter-complaint against CDJ, seeking a declaratory judgment that CDJ is not entitled to coverage for any damage or loss arising from the lien. Presently before the Court are the parties' cross-motions for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56 on September 14, 2012. The Court held a hearing with respect to the motions on November 29, 2012. For the reasons that follow, the Court grants CDJ's motion and denies Fidelity's motion.

I.      **Standard for Summary Judgment**

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S. Ct. at 2553. Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512. "A dispute over a material fact is not considered 'genuine' unless a reasonable jury could return a verdict for the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir.

2003) (citing *Liberty Lobby*, 477 U.S. at 248, 106 S. Ct. at 2510).

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255, 106 S. Ct. at 2513.

A court reviewing cross-motions for summary judgment, must evaluate each motion on its own, applying the above standard. *Westfield Ins. Co.*, 336 F.3d at 506 (citing *Taft Broad Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

## II.    Factual Background

CDJ is a Michigan limited liability company, formed on June 11, 2009, for the purpose of purchasing a number of condominium lots in a real property development known as Rustic Ridge Condominiums ("Rustic Ridge"). (Pl.'s Mot. Ex. A.) The members/owners of CDJ are David Phipps, Craig Hills, and John Weller. (*Id*. Ex. B; *see also* Def.'s Mot. Ex. 45.) Between July 2009 and mid-March 2010, CDJ purchased seventy-eight (78) of the ninety-seven (97) condominium units comprising Rustic Ridge from Rustic Ridge LLC.[1] (Def.'s Mot. Exs. 16, 18-19.) Prior to that time, as detailed

---

[1]Seventy-six units were conveyed via a quit claim deed executed on July 27, 2009, and recorded July 29, 2009. (Def.'s Mot. Ex. 16.) The remaining two units were conveyed via quit claim deeds recorded March 1, 2010. (*Id*. Exs. 18-20.).

3

below and in the attachment to this Opinion and Order, the units were transferred between various entities. (*See* Attach. A; *see also* Def.'s Mot. Ex. E.)

The Master Deed for Rustic Ridge was executed by Craig Piasecki on March 29, 2005, as authorized agent for J.C. Development Company, LLC. (Def.'s Mot. Ex. 5.) J.C. Development Company, LLC was comprised of Hills Development, Inc., whose president was Craig Hills, and Breeze Hills Corporation, of which John Weller was president, secretary, and treasurer. (*Id*. Ex. 28.) J.C. Development Company, LLC, through its authorized agent John A. Sanchez, thereafter conveyed the ninety-seven units comprising Rustic Ridge to J.C. Development- Rustic Ridge, LLC via a quit claim deed executed July 19, 2005, and recorded August 1, 2005.[2] (*Id*. Ex. 6.) The sole member of J.C. Development- Rustic Ridge, LLC was J.C. Development, LLC and its resident agent was Craig Hills. (*Id*. Exs. 30, 31.) J.C. Development, LLC's members were Ashlan Holdings, LLC, of which Mr. Hills and his wife were the managing members, and Merwell, LLC, of which Mr. Weller was the managing member. (*Id*. Ex. 32.) On August 1, 2005, a quit claim deed also signed by Mr. Sanchez as authorized agent of J.C. Development Company, LLC was filed, conveying the units from J.C. Development Company, LLC to J.C. Development Communities- Rustic Ridge, LLC. (*Id*. Ex. 7.) According to its operating agreement, J.C. Development Communities- Rustic Ridge, LLC had one manager, J.C. Development Communities, LLC, and its registered agent

---

[2] All conveyances referenced herein were recorded in the Wayne County Register of Deeds.

4

was John Sanchez. (*Id*. Ex. 36.) J.C. Development Communities, LLC's registered agent was Mr. Hills and its members were CN Hills Building, Inc., the president of which was Mr. Hills, and Breeze Hill Building, Inc, the president of which was Mr. Weller. (*Id*. Exs. 38, 50, 52.)

J.C. Development Company, LLC and J.C. Development Communities- Rustic Ridge, LLC conveyed the ninety-seven units via a quit claim deed executed by their authorized agent, Steve Conley, on October 26, 2005 and recorded November 4, 2005, to J.C. Development- Rustic Ridge, LLC. (*Id*. Ex. 8.) On October 28, 2005, Steve Conley executed a quit claim deed on behalf of J.C. Development- Rustic Ridge, LLC conveying the units to J.C. Development Communities- Rustic Ridge, LLC. (*Id*. Ex. 9.) This quit claim deed was recorded on November 9, 2005. (*Id*.)

J.C. Development Communities-Rustic Ridge LLC then conveyed the units to J.C. Development, LLC via a quit claim deed executed by Mr. Conley on October 31, 2005, and recorded November 22, 2005. (*Id*. Ex. 10.) Mr. Conley thereafter executed a quit claim deed, recorded December 12, 2006, conveying all but sixteen (16) of the units from J.C. Development, LLC to Rustic Ridge, LLC.[3] (*Id*. Ex. 11.) Mr. Conley was also the registered agent for Rustic Ridge, LLC, and the manager of one of its members: Maybranch Investments, LLC. (*Id*. Ex. 40.) Rustic Ridge, LLC's other member was J.C. Properties Management, LLC. (*Id*.) Mr. Conley was the registered agent for J.C.

---

[3]The units not conveyed to Rustic Ridge, LLC were units 25, 39, 49, 51, 53, 56, 57, 59, 63, 66, 76, 79, 83, 85, 87, and 95. (Def.'s Mot. Ex. 11.)

5

Properties Management, LLC, and its members were Ashlan Holdings, LLC (whose managing members were Mr. and Mrs. Hills) and Merwell, LLC (whose managing member was Mr. Weller). (*Id*. Ex. 42.)

J.C. Development, LLC conveyed two additional units (units 51 and 56) to Rustic Ridge, LLC via quit claims deeds recorded in March and April 2007. (*Id*. Ex. 13, 14.) Rustic Ridge, LLC conveyed one of the units (unit 2) back to J.C. Development, LLC in March 2007. (*Id*. Ex. 12.) These quit claim deeds were signed by Mr. Conley as authorized agent for the conveying entity (i.e. J.C. Development, LLC or Rustic Ridge, LLC). (*Id*. Exs. 12-14.) Rustic Ridge, LLC also conveyed a single unit (unit 90) to J.C. Properties Management, LLC via a quit claim deed executed by John Weller on July 10, 2009, and recorded August 4, 2009. (*Id*. Ex. 15.)

Finally (at least for purposes of this litigation), via quit claim deeds executed by John Weller and/or Craig Hills, Rustic Ridge, LLC conveyed seventy-eight (78) units to CDJ. (*Id*. Exs. 16-20.) The first deed, signed and recorded in July 2009, conveyed most of the units to CDJ. (*Id*. Ex. 16.) Two remaining units were conveyed to CDJ via quit claim deeds recorded March 1, 2010. (*Id*. Exs. 18, 20.) As indicated earlier, the members of CDJ are Messieurs Hills, Weller, and Phipps. Each member owns a 33.33% interest in CDJ. Pursuant to CDJ's operating agreement, Messieurs Hills and Weller were obligated to make initial cash contributions to the limited liability company in the amount of $100,000, each. (*Id*. Ex. 45.) Mr. Phipps was obligated to secure $1,000,000 of bank financing which was used to purchase the Rustic Ridge units. (*Id*.; *see also* Pl.'s Resp.

Ex. B ¶ 3.)

In summary, as a result of the conveyances described, the Rustic Ridge units were held as follows on March 1, 2010:

>CDJ: Units 1, 3-24, 26-38, 40-48, 50, 52, 54, 55, 58, 60-62, 64, 65, 67-75, 77, 78, 80-82, 84, 86, 88, 89, 92-94, 96, 97
>
>J.C. Development, LLC: Units 2, 25, 39, 49, 53, 57, 59, 63, 66, 76, 79, 83, 85, 87, 95
>
>J.C. Properties Management, LLC: Unit 90
>
>Rustic Ridge, LLC: Units 51, 56, 91

*See supra*; *see also* Attach. A.

Before purchasing the Rustic Ridge units, CDJ contacted Tonia Aloe, a title agent for Fidelity's predecessor, Lawyers Title Insurance Company ("Lawyers Title"), to secure title insurance. Ms. Aloe's employee, Patrick Hales, conducted an examination of matters recorded against the property being acquired and noted a Notice of Lis Pendens recorded by Mark Schulz on behalf of an entity known as Sunset Excavating, Inc. ("Sunset") on November 29, 2006. (Pl.'s Mot. Ex. D.) When the Commitment for issuance of the title policy was issued, therefore, Lawyers Title included as a requirement the "discharge of Notice of Lis Pendens in the matter of Mark Schulz, Inc., a Michigan Corporation vs J.C. D[e]velopment LLC which was recorded on November 29, 2006 . . .." (*Id*. Ex E.) In his examination, Mr. Hales also found a Claim of Lien that Sunset recorded on June 21, 2006, referencing a lien Sunset claimed upon the property for an unpaid portion of labor or material supplied to J.C. Development LLC on and before March 27, 2006. (*Id*. Ex. F

7

at No. 8; Ex. C at 23-24; Ex. G.) Mr. Hales mistakenly determined, however, that the lien had expired. (*Id.* Ex. C at 24; 31, 35.) The title Commitment therefore failed to note or require the discharge of the lien. (*Id.* Ex. E.)

After satisfaction of the conditions in the title Commitment, Lawyers Title issued an Owners Title Insurance Policy to CDJ, effective July 30, 2009, with policy no. C29-0279425 ("Policy"). (Compl. Ex. A.; Pl.'s Mot. Exs. F at No. 1, H.) The Policy provided insurance coverage in the amount of $1.2 million. (*Id.*)

In 2011, counsel for Sunset wrote a letter to several owners of condominium units within Rustic Ridge, including CDJ, asserting lien rights on behalf of Sunset. (Pl.'s Mot. Ex. C at 25-27.) Ms. Aloe received a copy of the letter from Sunset's counsel and contacted Mr. Weller. (Pl.'s Mot. Ex. C at 25-26.) Mr. Weller told Ms. Aloe that he did not know about the lien, did not know that it "was still an open issue," and "thought it had gone away and . . . didn't exist anymore." (*Id.* at 27, 29.) Mr. Weller indicated that he believed from his attorney in the litigation relating to Sunset that "there had been no action, and it had been dismissed." (*Id.* at 29.) Ms. Aloe also spoke with Mr. Hills regarding the lien, who expressed the same understandings as Mr. Weller. (*Id.* at 28.)

Ms. Aloe thereafter submitted a claim to Fidelity (which had succeeded Lawyers Title by this time) on behalf of CDJ. (*Id.* at 44.) Fidelity responded in a letter to Ms. Aloe dated July 12, 2011. (Pl.'s Mot. Ex. I.) In this letter, Fidelity acknowledged that the Sunset lien falls within the risks covered by the Policy, but concluded that the lien is excluded from coverage under Exclusion 3(a) as a lien "created suffered assumed or

8

agreed to by the Insured Claimant." (*Id*. at 3.)

The present litigation followed Fidelity's denial of the claim.

### III.     Applicable Law and Analysis

Construction and application of an unambiguous insurance policy presents a question of law for the court. *Doreen Mayhew & Co. v. CPA Mut. Ins. Co.*, 633 F. Supp. 2d. 434, 440 (E.D. Mich. 2007) (citing *Henderson v. State Farm Fire and Cas. Co.*, 460 Mich. 348, 353, 596 N.W.2d 190 (1999)). In *Auto Owners Insurance Company v. Churchman*, 440 Mich. 560, 489 N.W.2d 431 (1992), the Michigan Supreme Court provided the following summary of the principles applicable to a court's interpretation of an insurance contract:

> An insurance policy is much the same as any other contract. It is an agreement between the parties in which a court will determine what the agreement was and effectuate the intent of the parties. *Eghotz v. Creech*, 365 Mich. 527, 530, 113 N.W.2d 815 (1962). Accordingly, the court must look at the contract as a whole and give meaning to all terms. *Fresard v. Michigan Millers Mut. Ins. Co.*, 414 Mich. 686, 694, 327 N.W.2d 286 (1982). Further, "[a]ny clause in an insurance policy is valid as long as it is clear, unambiguous and not in contravention of public policy." *Raska v. Farm Bureau Mut. Ins. Co. of Michigan*, 412 Mich. 355, 361-362, 314 N.W.2d 440 (1982). This Court cannot create ambiguity where none exists. *Edgar's Warehouse, Inc. v. United States Fidelity & Guaranty Co.*, 375 Mich. 598, 602, 134 N.W.2d 746 (1965).
>
> Exclusionary clauses in insurance policies are strictly construed in favor of the insured. *Shelby Mut. Ins. Co. v. United States Fire Ins. Co.*, 12 Mich. App. 145, 149, 162 N.W.2d 676 (1968). However, coverage under a policy is lost if any exclusion within the policy applies to an insured's particular claims. *Fresard*, *supra*, 414 Mich. at 695, 327 N.W.2d 286. Clear and specific exclusions must be given effect. It is impossible to hold an insurance company liable for a risk it did not assume. *Kaczmarck v. La Perriere*, 337 Mich. 500, 506, 60 N.W.2d 327 (1953).

440 Mich. at 566-67, 489 N.W.2d at 433-34.

As relevant to this lawsuit, the Policy's covered risks section provides:

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, LAWYERS TITLE INSURANCE CORPORATION [Fidelity] . . . insures, as of Date of Policy and, to the extent stated in Covered Risks 9 and 10, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the insured by reason of:
. . .
2. Any defect in or lien or encumbrance on the Title. . . .

(Compl. Ex. A.) The exclusions are at issue in this case. They provide, in relevant part:

The following matters are expressly excluded from the coverage of this policy, and [Fidelity] will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:
. . .
3. Defects, liens, encumbrances, adverse claims, or other matters

(a) created, suffered, assumed, or agreed to by the Insured Claimant;

(b) not Known to the Company, not recorded in the Public Records at Date of Policy, but known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an insured under this policy . . .

(*Id.*) CDJ is identified as the insured under the Policy. (*See id.*) The Policy defines "Knowledge" or "Known" to mean: "Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title." (*Id.* at 1(f).)

Fidelity is relying on Exclusion 3(a) to deny CDJ's claim for coverage with respect

10

to the Sunset lien. The Sixth Circuit Court of Appeals has adopted the following "fairly well established" construction of the terms in this exclusion:

> The term "created" has generally been construed to require a conscious, deliberate and sometimes affirmative act intended to bring about the conflicting claim, in contrast to mere inadvertence or negligence. *Hansen v. Western Title Ins. Co.*, 220 Cal. App. 2d 531, 33 Cal. Rptr. 668, 671 (1963); *see also Arizona Title Ins. & Trust Co. v. Smith*, 21 Ariz. App. 371, 519 P.2d 860 (1974). Similarly, the term "suffered" has been interpreted to mean consent with the intent that "what is done is to be done," *First Nat. Bank & Trust Co. v. New York Title Ins. Co.*, 12 N.Y.S.2d 703, 171 Misc. 854 (N.Y. Sup. Ct. 1939), and has been deemed synonymous with "permit," which implies the power to prohibit or prevent the claim from arising. *Arizona Title Ins. & Trust Co. v. Smith*, 21 Ariz. App. 371, 519 P.2d 860 (1974). Further, an insured does not assume an assessment against property "merely because he agreed to take the property 'subject to' any assessments." *Id*. at 863. "Assume," under this definition requires knowledge of the specific title defect assumed. *See also McLaughlin v. Attorneys Title Guaranty Fund*, 61 Ill. App.3d 911, 18 Ill. Dec. 891, 378 N.E.2d 355 (1978). And "agreed to" carries connotations of "contracted," requiring full knowledge by the insured of the extent and amount of the claim against the insured's title. As with the other terms, this definition implies some degree of intent.

*American Sav. & Loan Ass'n v. Lawyers Title Ins. Corp.*, 793 F.2d 780, 784 (6th Cir. 1986) (footnote omitted). The court further provided:

> "The cases discussing the applicability of the 'created or suffered' exclusion generally have stated that the insurer can escape liability only if it is established that the defect, lien or encumbrance resulted from some intentional misconduct or inequitable dealings by the insured or the insured either expressly or impliedly assumed or agreed to the defects or encumbrances in the course of purchasing the property involved. The courts have not permitted the insurer to avoid liability if the insured was innocent of any conduct causing the loss or was simply negligent in bringing about the loss.

*Id*. (quoting *Brown v. St. Paul Title Ins. Co.*, 634 F.2d 1103, 1108-08 n.8 (8th Cir. 1980)).

11

Fidelity apparently concedes that the Sunset lien did not result from some conscious, deliberate act of CDJ and that CDJ, specifically, did not expressly or impliedly assume or agree to the lien when it purchased the property. This is because Fidelity instead is relying on alter ego and successor liability theories to impute the lien to CDJ. Fidelity also cites the imputed collective knowledge doctrine as a basis to impute to CDJ the knowledge and acts of J.C. Development-Rustic Ridge, LLC, J.C. Development, LLC, and/or Messieurs Hills and Wellers. Finally, Fidelity argues that allowing indemnification under the circumstances of this case would give CDJ an unwarranted windfall contrary to principles of equity.

### A. Fidelity's Alter-Ego Theory

Under Michigan law, the alter ego theory requires proof that the corporate entity is "a mere instrumentality of another individual or entity." *Rymal v. Baergen*, 262 Mich. App. 274, 293, 686 N.W.2d 241, 252 (2004) (citing *Foodland Distributors v. Al-Naimi*, 220 Mich. App. 453, 457, 559 N.W.2d 379 (1996)). Additionally, it must be shown that the corporate entity was "used to commit a wrong or fraud." *Id*. Finally, the plaintiff must establish that it suffered an unjust loss or injury. *Id*. Here, Fidelity is not able to create a genuine issue of material fact with respect to the first and second requirements.

First, the evidence fails to show that CDJ was a mere instrumentality of any other entity. Fidelity makes much of the fact that two of CDJ's members, Craig Hills and John Weller, were involved in many of the earlier entities tied to Rustic Ridge. However, Fidelity ignores that David Phipps, CDJ's remaining member, was not involved in any of

those earlier companies and that other individuals who were involved in the earlier entities were not involved in CDJ (specifically Steve Conley and John Sanchez). Fidelity contends that Messieurs Hills and Weller signed the majority of the quit claim deeds transferring units within Rustic Ridge. In fact, a review of those deeds indicates that it was Mr. Conley who signed most of the deeds. Fidelity's pleadings suggest that CDJ simply replaced Rustic Ridge, LLC as the owner of the Rustic Ridge project. In fact, however, the latter entity did not transfer all of its Rustic Ridge units to CDJ and, as indicated above, retained some of the units after the transfer. In short, Fidelity presents no evidence indicating that CDJ is a sham corporation or a mere instrumentality of Rustic Ridge, LLC (or for that matter, any of the other entities involved in the Rustic Ridge development).

In addition, Fidelity fails to show that CDJ was used to commit a fraud or wrong. While there is some debate as to whether Michigan law requires proof of fraud or illegality to pierce the corporate veil, *see Concept One Int'l, Inc. v. Nippecraft Ltd.*, No. 1:96-cv-565, 1997 WL 483248, at *5 n.2 (W.D. Mich. Feb. 14, 1997), it is clear that there must at least be proof of some "'unjustified use of the corporate form.'" *Id.* (quoting *United States v. Cordova Chem. Co. of Mich.*, 59 F.3d 584, 597 (6th Cir. 1995) (Ryan, J. dissenting ), judgment vacated pending rehearing en banc, 67 F.3d 586 (6th Cir.1995)). Fidelity presents no evidence to suggest that Rustic Ridge, LLC used CDJ unjustly or to commit some wrong.

The only act Fidelity identifies is the alleged attempt by Rustic Ridge, LLC to

avoid the Sunset Lien.[4] As set forth above, however, the evidence presented reflects that neither Mr. Hills nor Mr. Weller believed that the lien was in force before Sunset's counsel sent a letter in 2011 to certain condominium owners to enforce the lien. (Pl.'s Mot. Ex. C at 25-29.) According to Ms. Aloe, Mr. Hills and Mr. Weller believed that Sunset's lawsuit had been dismissed and that the lien had expired. (*Id*.) Notably, the title examiner, Mr. Hales, had reached the same conclusion when he viewed the record. Fidelity does not present a shred of evidence to support its assertion that Mr. Hills and Mr. Weller were aware of the Sunset lien before Rustic Ridge, LLC transferred the property to CDJ to suggest that the transfer was executed with the intent to evade the lien and/or obtain title insurance covering any loss for the lien.

For these reasons, the Court rejects Fidelity's alter ego theory as a basis for excluding coverage under the Policy.

**B.     Fidelity's Mere Continuation Theory**

Under Michigan law, the general rule is that a corporation purchasing the assets of another corporation does not, simply by virtue of the transaction, become liable for the obligations of the seller. *City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 251 (6th Cir. 1994) (citing *Turner v. Bituminous Cas. Co.*, 397 Mich. 406, 434-35, 244 N.W.2d 873, 878 n.3 (1976); *Pelc v. Bendix Mach. Tool Corp.*, 111 Mich. App. 343, 314 N.W.2d 614,

---

[4]Fidelity also may be relying on the various conveyances of the Rustic Ridge units among related entities, but it fails to specify why such transfers should be deemed improper or that they are not common in the development of such projects, which CDJ contends is the case.

617-18 (1981)). In *Turner*, the Michigan Supreme Court recognized four exceptions where successor liability may attach:

> (1) where the purchasing corporation expressly or impliedly agrees to assume the selling corporation's liabilities; (2) where the transaction amounts to a consolidation or merger of the two corporations; (3) where the purchasing corporation is a mere continuation of the selling corporation; and (4) where the transaction is entered into fraudulently, in order to escape liability for the obligations of the selling corporation.

397 Mich. at 436, 244 N.W.2d at 886. *Turner* was a products liability case and the primary rationale given by the Michigan Supreme Court for adopting the four exceptions was to provide the injured person some "place to turn for relief." *Id*. at 418-19, 244 N.W.2d at 878. As a result, as previously recognized by this Court, there is some uncertainty as to whether *Turner*'s exceptions are applicable to non-products liability cases. *See First Presbyterian Church of Ypsilanti v. H.A. Howell Pipe Organs, Inc.*, No. 07-13132, 2010 WL 419972, at *7 n.5 (E.D. Mich. Feb. 1, 2010). Because the Court concludes that none of the exceptions support successor liability in this case, for purposes of deciding the pending motions, it will assume that they apply outside the products liability context.

As to the first exception, there is no evidence that CDJ expressly or impliedly agreed to assume Rustic Ridge, LLC's liabilities (or specifically, the Sunset lien). With regard to the remaining exceptions, for the reasons discussed in subsection A, there is no evidence from which a reasonable jury could conclude that the transfer of the condominium units amounted to a consolidation or merger of CDJ and Rustic Ridge,

LLC, that CDJ was a mere continuation of Rustic Ridge, LLC, or that the transaction was "entered into fraudulently, in order to escape liability for the obligations of the selling corporation." *Turner, supra*. The Court will elaborate further on why the "mere continuation" exception does not apply.

This exception to the general rule of purchaser nonliability arises "where one corporation sells its assets to another corporation with the same people owning both corporations." *City Mgmt. Corp.*, 43 F.3d at 251 (citing *Turner*, 397 Mich. at 449, 244 N.W.2d at 892). However, the members of Rustic Ridge, LLC were not the same as CDJ. As set forth in the factual background section, the members of Rustic Ridge, LLC were J.C. Properties Management, LLC and May Branch Investments, LLC. J.C. Properties Management, LLC was held by Ashlan Holdings, LLC– whose members were Craig Hills and his wife– and Merwell, LLC– whose sole member was John Weller. The sole member of May Branch Investments, LLC was Steve Conley. Mr. Conley was not a member of CDJ. And the third member of CDJ, Mr. Phipps, was not involved with Rustic Ridge, LLC.

For these reasons, the Court finds no genuine issue of material fact supporting the use of the mere continuation theory of liability to apply Exclusion 3(a) of the Policy in this case.

### C. The Imputed Collective Knowledge Doctrine

Fidelity seeks to impute Craig Hills' and John Weller's knowledge concerning the Sunset lien on the entities for which they were agents. "'Under Michigan law, the

knowledge of a corporate agent can be imputed to the entire corporation.'" *Lower Town Project, LLC v. Lawyers Title Ins. Co.*, No. 10-11615, 2011 WL 3319710, at *12 (E.D. Mich. Aug. 1, 2011) (Edmunds, J.) (quoting *In re NM Holdings Co.*, 622 F.3d 613, 620 (6th Cir. 2010)). There are two reasons, however, why this doctrine has no applicability here.

First, and again, Fidelity presents no evidence to raise a genuine issue of fact as to whether Mr. Hills or Mr. Weller possessed knowledge of the Sunset lien's existence prior to 2011. The evidence presented indicates only that they were unaware of the lien. Second, and perhaps more importantly, this Court agrees with CDJ that the doctrine should not be utilized where doing so contradicts the plain and unambiguous terms of an insurance contract and allows for an exclusion not expressly set forth by the insurer in the contract.

The Policy sets forth express exclusions and conditions where coverage will not apply. Coverage is expressly excluded *inter alia* where there are "[d]efects, liens, encumbrances, adverse claims, or other matters . . . not known to the Company [Fidelity], not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy . . . ." (Pl.'s Compl. Ex. A.) The Policy requires "[a]ctual knowledge, not constructive knowledge . . . ." (*Id*.) Thus pursuant to the plain and ambiguous terms of the Policy, Fidelity may avoid liability only where there is *actual* knowledge of a lien "*not recorded*" and not disclosed to Fidelity.

As discussed previously, Fidelity fails to present evidence to create a genuine issue of material fact as to whether Mr. Hills or Mr. Weller knew– much less had actual knowledge– of the Sunset lien.  And, there is no dispute that the Sunset lien was recorded and disclosed to Fidelity.  Fidelity's agent, Mr. Hales, simply concluded, mistakenly, that the lien had expired.

For these reasons, the Court finds that the imputed knowledge doctrine is not applicable in this case.

### D.	Principles of Equity

Fidelity states the following to argue that CDJ will receive an unwarranted windfall if coverage is required under the circumstances of this case:

> To allow CDJ to collect for a defect in title arising from the actions of another limited liability company with the same managing members would effectively allow CDJ to have an unwarranted windfall by virtue of the fact limited liability companies or other business entities could simply transfer substantial assets between themselves, fail to disclose a lien on the substantial asset being transferred resulting from the preceding LLC's failure to pay a judgment, and go on to collect money from their insurer because they did not inform the insurer of the existence of the lien on the asset created, suffered, assumed, or agreed to by the preceding limited liability company operated by the identical common managing members.

(Def.'s Br. in Supp. of Mot. at 19.)  If the facts as developed by the record evidence were as Fidelity describes, perhaps principles of equity would require the Court to rule in Fidelity's favor.  In fact, the alter ego or mere continuation theories put forth by Fidelity most likely would entitle the insurer to avoid liability under those circumstances.  As discussed above, however, the evidence presented does not present this precise scenario.

As such, the Court cannot find that CDJ would receive a windfall if Fidelity is required to provide coverage in accordance with the plain and unambiguous terms of the Policy.

## IV.   Conclusion

The plain and unambiguous terms of the Policy require Fidelity to provide coverage for loss or damage to CDJ by reason of a lien on the title to the Property subject to the exclusions, exceptions, and conditions set forth therein.  Fidelity fails to create a genuine issue of material fact as to whether any of those exclusions, exceptions, or conditions apply here.  The evidence of record shows that none do.  The Court therefore concludes that Fidelity breached the Policy by failing to provide coverage for the Sunset lien.

As such, the Court will enter a judgment in favor of CDJ and against Fidelity upon CDJ's submission of the amount to which it believes it is entitled as damages.  Such submission shall be made within fourteen (14) days of this Opinion and Order.  Fidelity may respond to the submission within seven (7) days after its filing.

Accordingly,

**IT IS ORDERED**, that Plaintiff/Counter-Defendant CDJ Builders, LLC's motion for summary judgment is **GRANTED**;

**IT IS FURTHER ORDERED**, that Defendant/Counter-Plaintiff Fidelity National Title Insurance Company's motion for summary judgment is **DENIED**.

Dated: December 11, 2012                              s/PATRICK J. DUGGAN

                                                UNITED STATES DISTRICT JUDGE

Copies to:
Keefe A. Brooks, Esq.
Adam Kutinsky, Esq.